JOHN W. HUBER, United States Attorney (#7226)
ROBERT A. LUND, Assistant United States Attorney (#9579)
TYLER L. MURRAY, Assistant United States Attorney (#10308)
AMANDA A. BERNDT, Assistant United States Attorney (#15370)
BROCK R. BELNAP, Special Assistant United States Attorney (#6179)
Attorneys for the United States of America
111 South Main Street, Suite 1800 • Salt Lake City, Utah 84111
Telephone: (801) 524-5682 • Facsimile: (801) 325-3387

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>LYLE STEED JEFFS,<br><br>　　　　　Defendant. | Case No. 2:16-CR-0082-TS<br><br>**SUPERSEDING INDICTMENT**<br><br>VIOLS.<br>7 U.S.C. § 2024(b)&(c) & 18 U.S.C. § 371, CONSPIRACY TO COMMIT SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM BENEFITS FRAUD;<br><br>18 U.S.C. § 1956(h), CONSPIRACY TO COMMIT MONEY LAUNDERING;<br><br>18 U.S.C. § 3146(a)(1), FAILURE TO APPEAR<br><br>7 U.S.C. § 2024(f), 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), 18 U.S.C. § 982(a)(1), and 21 U.S.C. § 853, CRIMINAL FORFEITURE.<br><br>**Judge Ted Stewart** |

The Grand Jury alleges:

## INTRODUCTION

At all times relevant to this Indictment:

1. The United States Department of Agriculture (USDA) Food and Nutrition Service (FNS) operated the Supplemental Nutrition Assistance Program (SNAP). SNAP provided financial assistance to low income individuals and families to purchase food products.

2. USDA-FNS delegated authority to individual states to determine eligibility and to certify individual SNAP recipients who qualified for the program. Persons in need, who wished to obtain SNAP benefits, applied with the appropriate state agency. Approved applicants received an Electronic Benefits Transaction card (EBT card), similar to a bank debit card, linked to a SNAP account. The EBT cards possessed a magnetic strip containing electronically encoded information regarding the particular recipient and the dollar amount of benefits awarded. When a recipient presented a SNAP EBT card to a retailer to pay for eligible food items, the retailer deducted funds from the recipient's available SNAP benefits.

3. SNAP benefits applied only to the purchase of eligible food items. Recipients of SNAP benefits could not exchange their benefits for non-food items, household goods, or cash. Only members of the recipient household could permissibly use program benefits, and the application for benefits must have listed all members of the household who were entitled to receive benefits. Recipients agreed to the requirements and limitations of the program on the application for benefits.

4. Redemption of SNAP benefits occurred in a manner similar to a credit or debit card transaction, either by manually entering the account information or by swiping the EBT card through an electronic card reader at the store. The SNAP benefits recipient then entered a personal identification number (PIN) in the device's PIN pad to complete the transaction.

5. Only stores authorized by USDA-FNS could redeem SNAP benefits. To become eligible to

redeem SNAP benefits, a retailer must have completed, signed and submitted an "Application for Stores," Form FNS 252. USDA-FNS then issued a SNAP authorization number to the approved store. The approved retailer subsequently received reimbursement for redemptions via an electronic funds transfer directly into an authorized bank account designated by the retailer. A store operator participating as a SNAP retailer must have agreed on the "Application to Participate" that he or she understood the proper use and redemption of SNAP benefits and would abide by the requirements of the program.

6. The Fundamentalist Church of Jesus Christ of Latter-day Saints (FLDS church) dissented from the Church of Jesus Christ of Latter-day Saints (LDS church), after the LDS church renounced the practice of polygamy. In the 1930's, FLDS members began settling an area known as "Short Creek." The Short Creek community encompassed the incorporated cities of Hildale, Utah and Colorado City, Arizona, which straddle the Utah-Arizona border. Although separately incorporated in different states, the two cities operated as a single FLDS community. The two cities shared law enforcement officers and coordinated municipal activities. As of 2016, approximately 6,000 people resided in the Short Creek area.

7. In 2002, Warren Jeffs succeeded his father, Rulon Jeffs, as prophet and leader of the FLDS church. During two different periods of time, from approximately September of 2007 to March of 2012 and from November of 2012 until July of 2016, Lyle Jeffs, Warren Jeffs' brother, acted as the Bishop of the Short Creek Stake. In that capacity, Lyle Jeffs led the congregation of FLDS members in Colorado City, Arizona and Hildale, Utah. In the physical absence of Warren Jeffs, Lyle Jeffs handled the daily affairs of the organization, including its financial matters. Another of Warren Jeffs' brothers, Seth Jeffs, assisted with the administration of church matters, including financial matters, for a congregation of FLDS members in rural Custer County, South Dakota.

8. Starting in approximately 2011, FLDS leaders, including Lyle Jeffs, instituted the "United Order" within its ranks. Adherents to the United Order promised to donate their lives and all of their material substance to the church. Participation in the United Order purported to constitute the highest level of worthiness and spiritual preparedness in the church. Devout FLDS members aspired to eligibility in the United Order. Adherents to the United Order donated all of their material assets to the FLDS Storehouse, a communal clearinghouse charged with collecting and disbursing commodities to the community. United Order policy also dictated that members obtain their food and household commodities solely through the FLDS Storehouse. A large percentage of FLDS members in the Short Creek area received SNAP benefits, amounting to millions of dollars in benefits per year.

9. The FLDS leadership controlled several local businesses in the Short Creek area that served as extensions of the FLDS Storehouse. Two such businesses were the Meadowayne Dairy Store (hereinafter "Meadowayne") and Vermillion Cliffs Produce (hereinafter "Vermillion"). Meadowayne and Vermillion were small convenience stores. However, both stores engaged in abnormally large and frequent SNAP transactions, which rivaled and even surpassed the sales generated by much larger stores like Walmart and Costco.

10. Between 2011 and 2013, FLDS leaders directed members to divert their SNAP benefits to the FLDS Storehouse. These leaders, including Lyle Jeffs, held meetings in which they disseminated Storehouse protocols. The protocols dictated methods for diverting SNAP benefits to the FLDS Storehouse. These leaders also provided instruction on how to avoid suspicion and detection by the government.

11. Lyle Jeffs and other FLDS leaders directed members to divert their SNAP benefits to the church by purchasing food items at Meadowayne and Vermillion and physically transporting those items to

the Storehouse for donation or by converting SNAP benefits directly to fungible assets by swiping EBT cards at Meadowayne or Vermillion without the exchange of any food products.

12. Payment processors then deposited the SNAP proceeds into the accounts of Meadowayne and Vermillion. Under the direction of Lyle Jeffs and other FLDS leaders, the managers at Meadowayne and Vermillion transferred these funds to companies acting as a front for the FLDS Storehouse, Quality Wholesale Distributors (hereinafter "Quality"), Prime Wholesale Supply (hereinafter "Prime"), and Products Unlimited, thereby commingling SNAP fraud proceeds with other funds.

13. The front companies paid no payroll expenses for employees, utilized no advertising, established no internet presence, and incurred only nominal overhead costs. Specifically, Prime had no physical warehouse location and never registered with the Utah State Tax Commission or the Montana Department of Revenue. Similarly, Quality had no physical warehouse location and never filed corporate or payroll tax filings with the Utah State Tax Commission. Additionally, Quality reported only minimal sales revenues to state sales tax authorities, despite receiving millions of dollars in payments from Meadowayne and Vermillion. Transferring SNAP proceeds to Quality, Prime, and Products Unlimited concealed and disguised the nature, location, source, ownership and control of the proceeds corresponding to the fraudulent transactions. Consequently, Lyle Jeffs and other FLDS leaders maintained control of SNAP benefits from the fraud's initial directive to members, through Meadowayne and Vermillion's facilitation of the fraud, and to the concealment of the fraud by use of the front companies. The leaders, including Lyle Jeffs and others, then directed the use of those funds for purposes other than the purchase of eligible food products for authorized recipients.

14. Additionally, the leaders directed others to use the SNAP fraud proceeds diverted to Quality, Prime, and Products Unlimited to buy food and other items for distribution among church members, including individuals who were not authorized to receive SNAP benefits. These distributions

encouraged the further diversion of SNAP funds and so promoted the scheme and enabled it to continue.

15. Seth Jeffs acted as a signator on the Quality bank account into which Meadowayne's operators transferred SNAP fraud proceeds. He also possessed a credit card issued in his name that Quality used to purchase goods for the Storehouse.

16. John Clifton Wayman was a member of the FLDS church and a participant in the United Order. For several months during 2012, he acted as the FLDS Bishop of the Short Creek Stake congregation. In that capacity, he disseminated protocols for fraudulently diverting SNAP benefits to the FLDS Storehouse, and he ordered the disposition of SNAP funds for unlawful purposes. After collecting EBT cards from legitimate beneficiaries, he provided those cards to another individual and ordered that person to use SNAP funds to purchase food and goods for non-eligible persons.

17. Kimball Dee Barlow was a member of the FLDS church and a participant in the United Order. He managed the FLDS Storehouse, the central location to gather and distribute food, goods, and commodities to the FLDS community. He disseminated protocols for fraudulently diverting SNAP benefits to the FLDS Storehouse. He possessed signatory authority for bank accounts corresponding to the front corporations, Quality, Prime, and Products Unlimited. Through financial transactions involving these accounts, Kimball Barlow disposed of SNAP funds to unintended and ineligible beneficiaries and for unapproved purposes.

18. Winford Johnson Barlow was a member of the FLDS church and a participant in the United Order. Between May of 2012 and April of 2015, Winford Barlow acted as the president of Meadowayne. On May 23, 2013, Winford Barlow signed an Application for Stores on behalf of Meadowayne certifying that he agreed with the conditions of participation and agreeing to comply with all statutory and regulatory requirements of the SNAP program. Winford Barlow participated

at meetings in which FLDS leaders directed members to fraudulently divert their food stamp benefits to the FLDS Storehouse. He possessed signatory authority for several of Meadowayne's bank accounts, and he signed checks on those accounts, including payroll checks to Meadowayne employees.

19. Rulon Mormon Barlow was a member of the FLDS church and a participant in the United Order. Mormon Barlow participated at meetings in which FLDS leaders directed members to fraudulently divert their SNAP benefits to the FLDS Storehouse. Knowing that the activity of the business facilitated the unlawful diversion of SNAP funds to the FLDS church, Mormon Barlow served as the general manager of Meadowayne and supervised the daily operations of the business. He possessed signatory authority for Meadowayne's bank accounts, and he signed checks on those accounts. With the intent, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the funds, Mormon Barlow transferred SNAP fraud proceeds to accounts associated with Quality.

20. Ruth Peine Barlow was a member of the FLDS church, and she was married to Rulon Mormon Barlow. She participated at meetings in which FLDS leaders directed members to fraudulently divert their food stamp benefits to the FLDS Storehouse. Knowing that the activity of the business facilitated the unlawful diversion of SNAP funds to the FLDS church, she assisted Mormon Barlow in the daily operations of Meadowayne. On many occasions, while working the registers at Meadowayne, she actively participated in fraudulent transactions involving SNAP funds. She also possessed signatory authority for Meadowayne's bank accounts, and she signed checks on those accounts. With the intent, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the funds, Ruth Barlow signed checks transferring SNAP fraud proceeds from Meadowayne to Quality, Prime, and Products Unlimited.

21. Hyrum Bygnal Dutson was a member of the FLDS church and a participant in the United Order. Hyrum Dutson participated at meetings in which FLDS leaders directed members to fraudulently divert their food stamp benefits to the FLDS Storehouse. Knowing that the activity of the business facilitated the unlawful diversion of SNAP funds to the FLDS church, Hyrum Dutson served as the general manager of Vermillion Cliff's Produce, and he supervised the daily operations of the business. He possessed signatory authority for Vermillion's bank accounts, and he signed checks on those accounts. With the intent, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds, Hyrum Dutson transferred SNAP fraud proceeds to accounts associated with Quality and Products Unlimited.

22. Kristal Meldrum Dutson was a member of the FLDS church, she was a participant in the United Order, and she was married to Hyrum Dutson. Kristal Dutson participated at meetings in which FLDS leaders directed members to fraudulently divert their food stamp benefits to the FLDS Storehouse. On June 8, 1999, Kristal Dutson signed an Application for Stores certifying her understanding of the requirements of the food stamp program. Thereafter, knowing that the activity of the business facilitated the unlawful diversion of SNAP funds to the FLDS church, Kristal Dutson assisted Hyrum Dutson in the daily operations of Vermillion. Kristal Dutson also possessed signatory authority for Vermillion's bank accounts, and she signed checks on those accounts. With the intent, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds, Kristal Dutson signed checks transferring SNAP fraud proceeds from Vermillion to Quality.

23. Preston Yates Barlow was a member of the FLDS church and a participant in the United Order. He participated at meetings in which FLDS leaders directed members to fraudulently divert their food stamp benefits to the FLDS Storehouse. In approximately October of 2015, knowing that the

activity of the business facilitated the unlawful diversion of SNAP funds to the FLDS church, he took over managerial control of Meadowayne and obtained signatory authority over Meadowayne's bank accounts. With the intent, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds, he transferred SNAP fraud proceeds to Quality and Prime.

## OBJECT OF THE CONSPIRACY

24. As set forth in the Introduction above, the Grand Jury alleges that the defendant participated in a conspiracy to defraud the Supplemental Nutrition Assistance Program. The object of the conspiracy entailed diverting SNAP proceeds from authorized beneficiaries to leaders of the FLDS church for use by ineligible beneficiaries and for unapproved purposes.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

25. At various times between 2011 and 2016, the defendant and other co-conspirators engaged in the following acts in furtherance of the scheme to defraud:

26. In January and February of 2011, at the Leroy Sunderland Johnson meetinghouse, in Colorado City, Arizona, FLDS leaders, including Lyle Jeffs, initiated the United Order of Short Creek, requiring members to donate all of their material possessions to the FLDS church.

27. Between on or about mid-2011 and February of 2016, at various locations throughout the Short Creek community, FLDS leaders, including Lyle Jeffs and others, directed FLDS members to unlawfully divert their SNAP benefits to the FLDS Storehouse through FLDS controlled businesses, including Meadowayne and Vermillion. For example, on or about December 12, 2011, at the Leroy Sunderland Johnson meetinghouse, in Colorado City, Arizona, Lyle Jeffs issued that directive. At that same meeting, Seth Jeffs and Kimball Barlow also gave instruction on how to divert SNAP benefits to the FLDS Storehouse.

28. Between on or about mid-2011 and February of 2016, FLDS members transferred their SNAP benefits to FLDS controlled stores without receiving eligible food products at the time of the transactions. For example, on October 16, 2015, an FLDS member with the initials S.R. conducted a SNAP transaction totaling $800 at Meadowayne without receiving any food products. Similarly, on November 30, 2015, an FLDS member with the initials S.N.J. conducted a SNAP transaction totaling $2,627 at Meadowayne without receiving any food products.

29. Between on or about mid-2011 and February of 2016, FLDS members also purchased food items from FLDS controlled stores using SNAP funds and delivered those items to the FLDS Storehouse for redistribution. For example, on November 14, 2015, an FLDS member with the initials S.B. purchased $511 worth of food products from Meadowayne using SNAP funds. Instead of keeping those food items for use by eligible members of her household, S.B. delivered those items to the FLDS Storehouse for redistribution.

30. On or about March 23, 2011, an FLDS member, at the direction of Lyle Jeffs, instructed a surrogate to organize Quality Wholesale Distributors in Hildale, Utah, in order to act as a front company for the FLDS Storehouse.

31. On or about March 2012, in Hildale, Utah, knowing that it constituted an unapproved use and transfer of SNAP benefits, John Wayman collected EBT cards from legitimate beneficiaries, provided those cards to another individual, and directed that other person to use SNAP funds to purchase food and goods for non-eligible persons.

32. Between approximately mid-2011 and February of 2016, managers of Meadowayne and Vermillion transferred SNAP fraud proceeds to Quality. For example, on August 27, 2013, Mormon Barlow signed a check for $15,000 to Quality, drawn on Meadowayne's Wells Fargo bank account. On or about March 17, 2015, Ruth Barlow signed a check for $24,489 to Quality drawn on

Meadowayne's Wells Fargo bank account. On or about November 24, 2015, Preston Barlow signed a check for $2,000 to Quality drawn on Meadowayne's Wells Fargo bank account. On or about November 16, 2011, Hyrum Dutson signed a check for $18,520 to Quality drawn on Vermillion's American West Bank account. On or about December 8, 2011, Kristal Dutson signed a check for $5,000 to Quality drawn on Vermillion's American West Bank account.

33. Between April 7, 2015 and February of 2016, Ruth Barlow and Preston Barlow transferred SNAP fraud proceeds from Meadowayne's bank account to an account associated with Prime Wholesale Supply. For example, on or about April 20, 2015, Ruth Barlow signed a check for $22,685 to Prime drawn on Meadowayne's Wells Fargo bank account. On or about December 1, 2015, Preston Barlow signed a check for $35,237 to Prime drawn on Meadowayne's Wells Fargo bank account.

34. On or about September of 2011 and continuing thereafter, managers of the FLDS controlled businesses transferred SNAP fraud proceeds to Products Unlimited. For example, on or about July 7, 2015, Kimball Barlow signed a check for $10,984 to Products Unlimited drawn on Prime's Chase account. On or about March 4, 2015, Kimball Barlow also signed a check for $11,024 to Products Unlimited drawn on Quality's Chase account. On or about December 16, 2014, Ruth Barlow signed a check for $31,148 to Products Unlimited drawn on Meadowayne's Wells Fargo account. On or about December 4, 2012, Hyrum Dutson signed a check for $11,202 to Products Unlimited drawn on Vermillion's American West Bank account.

35. Between May 5, 2015 and the date of this indictment, Kimball Barlow transferred SNAP fraud proceeds from Prime to Quality. For example, on or about June 18, 2015, Kimball Barlow signed a check for $6,228 to Quality drawn on Prime's Chase account.

36. In contravention of the controlling legal authorities, ineligible persons used SNAP funds. For

example, on October 9, 2015, an FLDS member with the initials G.J. conducted a SNAP funds transaction at Meadowayne in the amount of $914 using the EBT card corresponding to N.J. As G.J. was not an authorized beneficiary from N.J.'s household and because G.J obtained no food items from the store, G.J. used the SNAP funds unlawfully.

37. SNAP fraud proceeds also financed ineligible purchases. For example, between June 4, 2013 and September 26, 2014, Meadowayne paid John Deere Financial at least $31,083 in SNAP fraud proceeds for the purchase of a John Deere tractor. Between November 15, 2012 and February 16, 2016, Meadowayne paid Ford Motor Credit at least $31,821 in SNAP fraud proceeds for the purchase of a Ford F350 pickup truck. Between September 23, 2011 and October 19, 2015, Meadowayne paid Intermountain Farmers Association at least $511,376 in SNAP fraud proceeds for the purchase of farming supplies.

## **FAILURE TO APPEAR**

38. On February 17, 2016, Lyle Steed Jeffs was indicted by a federal grand jury for violations of 18 U.S.C. § 371 (Conspiracy to Commit Supplemental Nutrition Program Benefits Fraud) and 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) in a matter filed as *United States v. Lyle Steed Jeffs, et al.*, 2:16-CR-00082-TS.

39. On June 9, 2016, Lyle Steed Jeffs was released from pretrial detention pursuant to Chapter 207, of Title 18, United States Code. In its order, the Court required that Lyle Steed Jeffs promised to appear in court as required, to submit to Global Positioning Satellite (GPS) monitoring by way of an ankle monitor to be worn at all times, and to submit to home detention at a residence in Salt Lake County.

40. On or about June 18, 2016, Lyle Steed Jeffs removed his ankle GPS monitor and left his residence in Salt Lake County in the District of Utah, in violation of his conditions of pretrial release.

41. On or about October 4, 2016, Lyle Steed Jeffs failed to appear before the United States District Court for the District of Utah in the matter of *United States v. Jeffs*, 2:16-CR-00082-TS, as he was required to do so by court order.

## COUNT 1
## 18 U.S.C. § 371
### (Conspiracy to Commit SNAP benefits fraud)

42. The Grand Jury realleges and incorporates by this reference the factual allegations set forth in paragraphs 1 through 37 above.

43. Beginning on a date unknown to the Grand Jury, but not later than September 1, 2011 and continuing through at least February of 2016, in the Central Division of the District of Utah and elsewhere,

LYLE STEED JEFFS,

the defendant herein, did knowingly and intentionally combine, conspire, confederate, and agree with others known and unknown to the Grand Jury to commit the following offenses against the United States:

a) Knowingly using, transferring, acquiring and possessing Supplemental Nutrition Assistance Program ("SNAP") benefits, valuing $5,000 or more, in any manner contrary to the governing statute and regulations, in violation of 7 U.S.C. § 2024(b); and

b) Knowingly presenting and causing to be presented for payment and redemption, SNAP benefits valuing $100.00 or more, knowing the same to have been received, transferred, and used in any manner in violation of the governing statute regulations, in violation of 7 U.S.C. § 2024(c);

All in violation of 18 U.S.C. § 371.

## COUNT 2
## 18 U.S.C. § 1956(h)
### (Conspiracy to Commit Money Laundering)

44. The Grand Jury realleges and incorporates by this reference the factual allegations set forth in paragraphs 1 through 37 above.

45. Beginning on a date unknown to the Grand Jury, but not later than September 1, 2011 and continuing through at least February of 2016, in the Central Division of the District of Utah and elsewhere,

LYLE STEED JEFFS,

the defendant herein, did knowingly and intentionally combine, conspire, confederate, and agree with others known and unknown to the Grand Jury to commit offenses against the United States:

a) Knowingly conducting and attempting to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, Supplemental Nutrition Assistance Program Benefits Fraud, in violation of 7 U.S.C. § 2024(b) and (c), knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

b) Knowingly engaging and attempting to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, deposits, withdrawals, and transfers of proceeds of Supplemental Nutrition Assistance Program Benefits Fraud, in violation of

7 U.S.C. § 2024(b) and (c), such property having been derived from a specified unlawful activity, that is, Supplemental Nutrition Assistance Program Benefits Fraud, in violation of 18 U.S.C. § 1957.

All in violation of 18 U.S.C. § 1956(h)

### COUNT 3
### 18 U.S.C. § 3146(a)(1)
### (Failure to Appear)

46. The Grand Jury realleges and incorporates by this reference the factual allegations set forth in paragraphs 38 through 41 above.

47. On or about October 4, 2016, in the Central Division of the District of Utah,

LYLE STEED JEFFS,

the defendant herein, having previously been charged by Indictment on February 17, 2016 with:

COUNT ONE: 18 U.S.C. § 371 Conspiracy to Commit Supplemental Nutrition Assistance Program Benefits Fraud;

COUNT TWO: 18 U.S.C. § 1956(h) Conspiracy to Commit Money Laundering;

The latter count being a felony punishable by imprisonment for a term of imprisonment of 15 years or more, and having been released by the United States District Court for the District of Utah, pursuant to Chapter 207 of Title 18, United States Code, did knowingly and willfully fail to appear before the court, as required by the conditions of his release and by court order; all in violation of Title 18, United States Code, Sections 3146(a)(1) and 3146(b)(1)(A)(i).

### NOTICE OF INTENT TO SEEK FORFEITURE

Pursuant to 7 U.S.C. § 2024(f), upon conviction of any offense in violation of 7 U.S.C. § 2024(b) and (c), as set forth in this indictment, the defendant shall forfeit to the United States of America all property, real and personal, used in a transaction or attempted transaction, to

commit, or to facilitate the commission of, such violation, or proceeds traceable to such violation. The property to be forfeited includes, but is not limited to, the following:

- A MONEY JUDGMENT equal to the value of proceeds traceable to such offense and any property, real or personal, used to facilitate the commission of such offense.

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of any felony offense in violation of 7 U.S.C. § 2024(b) and (c), involving a quantity of benefits having a value of not less than $5,000, the defendant shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to such violation or a conspiracy to commit such offense. The property to be forfeited includes, but is not limited to, the following:

- A MONEY JUDGMENT equal to the value of proceeds traceable to such offenses.

Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of any offense in violation of 18 U.S.C. § 1956(h), the defendant shall forfeit to the United States of America any property, real or personal, involved in such offenses, and any property traceable to such property. The property to be forfeited includes, but is not limited to the following:

- A MONEY JUDGMENT equal to the value of all property involved in the money laundering.

## SUBSTITUTE ASSETS

If any of the above-described forfeitable property, as a result of any act or omission of the defendant,

      (1) cannot be located upon the exercise of due diligence;
      (2) has been transferred or sold to, or deposited with, a third person;
      (3) has been placed beyond the jurisdiction of the court;
      (4) has been substantially diminished in value; or
      (5) has been commingled with other property which cannot be divided,

it is the intent of the United States, pursuant to 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the above-forfeitable property.

A TRUE BILL:

/s/
FOREPERSON OF THE GRAND JURY

JOHN W. HUBER
United States Attorney

ROBERT A. LUND
Assistant United States Attorney
TYLER L. MURRAY
Assistant United States Attorney
AMANDA A. BERNDT
Assistant United States Attorney
BROCK R. BELNAP
Special Assistant United States Attorney