JOHN W. HUBER, United States Attorney (#7226)
ROBERT A. LUND, Assistant United States Attorney (#9579)
TYLER L. MURRAY, Assistant United States Attorney (#10308)
AMANDA A. BERNDT, Assistant United States Attorney (#15370)
BROCK R. BELNAP, Special Assistant United States Attorney (#6179)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

---

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>LYLE JEFFS,<br><br>　　　　　　　Defendant. | Case No. 2:16-CR-82-TS<br><br>**SENTENCING MEMORANDUM OF THE UNITED STATES**<br><br><br><br>District Court Judge Ted Stewart |

COMES NOW, the United States of America, by and through the undersigned Assistant United States Attorney, and submits its memorandum related to the sentencing hearing of Lyle Jeffs.  Based on the facts and applicable legal authority, the United States respectfully contends that the defendant's conduct merits the maximum sentence applicable under the stipulated guideline range.

## STATEMENT OF FACTS AND APPLICATION OF LAW

**1.  LYLE STEED JEFFS' ROLE IN THE OFFENSE**

In 2002, Warren Jeffs succeeded his father, Rulon Jeffs, as prophet and leader of the

FLDS church.  After Warren Jeffs's subsequent imprisonment, the defendant, Lyle Jeffs,

succeeded Warren Jeffs as the ostensible leader of the organization.  From approximately

September of 2007 to July of 2016, the defendant acted as the Bishop of the Short Creek Stake of

Zion.  In that capacity, the defendant led the FLDS membership.  In the physical absence of

Warren Jeffs, the defendant handled the daily affairs of the organization, including its financial

matters.

Starting in approximately 2011, the defendant, in concert with Warren Jeffs, instituted the

"United Order" within the FLDS community.  Adherents to the United Order promised to donate

their lives and all of their material substance to the church.  Participation in the United Order

purported to constitute the highest level of worthiness and spiritual preparedness in the church.

Devout FLDS members aspired to eligibility in the United Order.  At the defendant's direction,

adherents donated all of their material assets to the FLDS Storehouse, a communal clearinghouse

charged with collecting and disbursing commodities to the community.  United Order policy also

dictated that members obtain their food and household commodities solely through the FLDS

Storehouse.  A large percentage of FLDS members in the Short Creek area received SNAP

benefits, amounting to millions of dollars in benefits per year.

As the leader of the FLDS community, the defendant controlled several local businesses

in the Short Creek area that served as extensions of the FLDS Storehouse.  Two such businesses

were the Meadowayne Dairy Store (hereinafter "Meadowayne") and Vermillion Cliffs Produce

(hereinafter "Vermillion").  Meadowayne and Vermillion were small convenience stores. However, both stores engaged in abnormally large and frequent SNAP transactions, which rivaled and even surpassed the sales generated by much larger stores like Wal-Mart and Costco.

Between 2011 and 2013, the defendant directed members to divert their SNAP benefits to the FLDS Storehouse.  The defendant and his surrogates held meetings in which they dictated the methods for diverting SNAP benefits to the Storehouse.  These leaders also provided instruction on how to avoid suspicion and detection by the government.[1]

Specifically, the defendant directed members to divert their SNAP benefits to the church by purchasing food items at Meadowayne and Vermillion and physically transporting those items to the Storehouse for donation or by converting SNAP benefits directly to fungible assets by swiping EBT cards at Meadowayne or Vermillion without the exchange of any food products.

Payment processors then deposited the SNAP proceeds into the accounts of Meadowayne and Vermillion.  Under the defendant's direction, the managers at Meadowayne and Vermillion transferred those funds to companies acting as a front for the FLDS Storehouse, Quality Wholesale Distributors (hereinafter "Quality"), Prime Wholesale Supply (hereinafter "Prime"), and Products Unlimited, thereby commingling SNAP fraud proceeds with other funds.  The defendant then directed the use of those funds for purposes other than the purchase of eligible food products for authorized recipients.

---

[1] On April 12, 2012, according to witness accounts, the defendant presided at a Storehouse meeting where Robert Knudson provided training.  Also present were Kimball Barlow, Seth Jeffs, Bob Barlow, Oliver Barlow, and Winford Barlow.  Robert Knudson instructed UO members to use their SNAP benefits solely at approved FLDS businesses, such as Meadowayne Dairy and Vermillion Cliffs Produce.  He also directed members to avoid "fraud triggers" and "alerts to the system" when consecrating SNAP benefits.  He said, "don't do even amounts," meaning don't just swipe an even dollar amount at the stores.

Because the defendant acted as a leader and organizer of the scheme that involved at least 5 other participants, including the 9 other defendants who pleaded guilty a SNAP fraud charge, a role in the offense enhancement applies to the defendant's conduct.  U.S.S.G. § 3B1.1(a).  A four-level enhancement applies because "the criminal activity involved five or more participants or was otherwise extensive."  *Id.*  For the enhancement to apply, the United States need not prove that the defendant controlled five or more participants.  *United States v. Cruz Camacho*, 137 F.3d 1220, 1224 (10th Cir. 2009). The government must only "prove that five persons participated in the criminal venture, and that Defendant exercised leadership control over at least one person." *Id.*

## 2.  SNAP FRAUD LOSS CALCULATION

From September 1, 2011 through February 17, 2016, over 247,000 SNAP card transactions involving over 2,700 individual SNAP cards were conducted at Meadowayne Dairy and Vermillion Cliffs.  For the two stores combined, the sales value of SNAP transactions exceeded $16,000,000, which comprised of both legitimate and fraudulent transactions. SNAP funds, by far, represented the largest source of revenue for Meadowayne and Vermillion.  For Meadowayne, SNAP consisted of 69% of total income reported in its own accounting system. For Vermillion, SNAP represented 84% of total deposits in its primary business account. (Exhibit-A at 5, 19).

Due to the logistical impossibility of reviewing over 247,000 SNAP transactions to determine which transactions involved fraud, investigators used USDA statistical data, witness statements, video surveillance, evidence obtained from search warrants, and data from another FLDS-owned store that accepted SNAP benefits (Cooperative Mercantile Corporation) to

conclude that SNAP transactions greater than $100 involved fraud.  Investigators then traced this SNAP fraud amount through the accounts for Meadowayne and Vermillion and into the accounts for the front companies, Quality, Prime, and Products Unlimited.

For the time period of September 1, 2011 to February 17, 2016, SNAP proceeds at Meadowayne and Vermillion totaled $16,058,206.  After applying the $100 fraud threshold, investigators calculated the SNAP fraud loss at $11,237,261.  The breakdown between Meadowayne and Vermillion follows:

| | Meadowayne | | Vermillion | | Totals |
|---|---|---|---|---|---|
| | **Amount** | **Percent** | **Amount** | **Percent** | |
| **Total SNAP** | $10,615,311 | | $5,442,895 | | **$16,058,206** |
| **SNAP >= $100** | $7,561,281 | 71% | $3,675,980 | 68% | **$11,237,261** |

## 3.  SUBSTANTIATION OF SNAP FRAUD LOSS CALCULATION

In relation to the estimation of loss for sentencing purposes, the United States Sentencing Guidelines (U.S.S.G.) §2B1.1 provides that "[t]he court need only make a reasonable estimate of the loss."  In fixing the loss figure at $11,237,261, investigators relied on the following:

- ***USDA Analysis***

The USDA routinely applies the standard of 300% of the national average transaction amount for similar-sized stores as a means to determine fraud.  In the instant case, Meadowayne and Vermillion classified themselves as large grocery stores.  The national average transaction size for a large grocery store is $25.00.  However, given their square footage, number of registers, and inventory volume, USDA standards more accurately classify Meadowayne and Vermillion as convenience stores or small grocery stores.  (Exhibit C, photographs of the stores). The average transaction size for a convenience store is only $7.00.

Using the USDA fraud standard of 300% of the average transaction size, SNAP transactions of $75 or more at a large grocery store would presumably involve fraud.  In the instant case, as a conservative measure, the investigators increased the fraud threshold to 400% of the average transaction size for a large grocery store ($100) to calculate the loss figure, even though Meadowayne and Vermillion did not qualify as large grocery stores.

Using USDA statistics, investigators also compared Meadowayne and Vermillion with other local stores.  For example, investigators analyzed USDA data corresponding to Bee's Market, a grocery store approximately 2 miles from Meadowayne's location.  Bee's Market serves the same demographic (e.g., large polygamous families) and offers a much larger product inventory than Meadowayne and Vermillion.  (Exhibit C).  Tellingly, Bee's Market's SNAP redemptions proved consistent with the national large grocery store SNAP transaction average of $25.00.  Similarly, the Wal-Mart located in nearby Hurricane, Utah, qualifies as a superstore, whose store size, product inventory, number of registers, and number of patrons stand in stark contrast with small stores such as Meadowayne.  However, from January 2011 through February 2016, Meadowayne reported larger dollar values and transaction sizes for SNAP redemptions than did Wal-Mart.  (Exhibit-B at 1-3).

For both Meadowayne and Vermillion, the vast majority of the SNAP transactions were under $25.  However, both stores experienced a prevalence of extremely high dollar SNAP transactions.  For example, excessively large SNAP transactions occurred at Meadowayne on May 13, 2013 and July 16, 2013 in the amounts of $3,824.51 and $4,515.17 respectively. (Exhibit-A at 6).  In fact, over 4,100 SNAP transactions at Meadowayne and Vermillion involved amounts greater than $1,000.  Given the small size of the stores and the perishable

nature of food, these excessively large transactions clearly indicate the commission of fraud, the transfer of SNAP benefits to the control of the FLDS Church.  All of the factors listed above support the notion that the higher the individual SNAP transaction the more likely the transaction involved fraud.

As previously indicated, the defendant required FLDS members to consecrate their SNAP benefits through local FLDS controlled stores, including Cooperative Mercantile Corporation (CMC).  In November 2012, CMC ceased processing SNAP benefits.  Upon its closure, the defendant instructed members to consecrate their SNAP cards through Meadowayne.  Within six months of CMC's closure, Meadowayne experienced a 236% increase in SNAP benefit redemptions.  The measurable increase in SNAP redemptions at Meadowayne, from November 2012 through February 2016, roughly equates to the $7,500,000 that investigators identified as fraud proceeds received at that particular store.  (Exhibit-B at 4, 5).

In addition to USDA statistical data, witnesses corroborate the $100 fraud threshold.   For example, Alleen Steed, a former United Order member who lived in the community, told investigators that SNAP transactions of over $100 at Meadowayne likely involved diverted funds.

- ***Pole Camera Analysis***

For a one-year period starting in February 2015, investigators placed hidden cameras outside the Meadowayne store.  Thereafter the investigators analyzed the video footage against USDA transactional data.  The analysis revealed that a large number of transactions of $100 or more involved patrons who swiped their SNAP cards in the store and left the store with little or

no food, or they went to the back dock and obtained product to transport to the FLDS

Storehouse.

- ***Title III Analysis***

With judicial authorization, the investigators also installed a hidden camera inside the

Meadowayne store.  Additionally, the investigators seized footage from Meadowayne's internal

security camera.  Viewing footage from both cameras allowed investigators to more closely

observe and examine individual SNAP transactions. Specifically, investigators examined all 670

SNAP transactions in amounts equal to or greater than $100 conducted at Meadowayne from

October 1, 2015 through November 19, 2015.  From that analysis, investigators concluded that

560 of the 670 transactions (84%) involved fraud (Exhibit-L), based on one of more of the

following fraudulent indicators:

- No food products were exchanged during the SNAP sale transaction.
- A consecration paper was provided to the patron.
- Products purchased were not commensurate with SNAP transaction amount.
- The customer drove to the back dock to load up bulk food products (e.g., multiple boxes of lettuce, carrots, or the like not associated with a household related purchase).
- Multiple SNAP transactions were conducted by a single patron during the same visit.

For the same period, October 1, 2015 to November 19, 2015, all SNAP redemptions at

Meadowayne (5,564 transactions) totaled $367,974.37, and, by value, 69.6% ($255,965.48)

involved transactions greater than $100.00.  Finally, records obtained through the search warrant

executed on February 23, 2016 specifically identified the consecration of SNAP benefits.  At

Meadowayne and at the FLDS Storehouse, investigators located consecration records provided

by employees to patrons during SNAP transactions.  (Exhibit-C at 10).  Investigators also located

records at the Storehouse corresponding to consecrations made at Vermillion.

Similarly, investigators located "Monthly Family Expense Reports," required by the FLDS leadership, detailing SNAP consecrations by members.  In many instances, investigators traced consecrations referenced in seized documents to USDA records corresponding to transactions at CMC, Meadowayne and Vermillion.  (Exhibit-D.5 at 38-42).  Based on that evidence, investigators validated the $100 fraud threshold.

In short, the evidence collected by investigators establishes that SNAP transactions at Meadowayne and Vermillion in amounts greater than $100 likely represented transactions in which FLDS members diverted SNAP benefits to the control of defendant and the FLDS church, rather than transactions related to purchasing eligible food for authorized households, as required by SNAP regulations.

### 4.  RESPONSE TO ANTICIPATED DEFENSE LOSS ARGUMENTS

Based on discussions with defense counsel, the United States anticipates that the defendant may quarrel with the loss number because the calculation fails to "offset" the loss by the amount of food purchased by FLDS controlled entities.  That objection lacks both legal and factual merit.

- ***The fraud occurred at the register***

USDA regulations require beneficiaries to receive purchased food items at the time the beneficiaries redeem SNAP benefits.  7 C.F.R. § 274.7(b).  Therefore, when patrons donated their benefits without receiving food at the time of the transaction, the fraud was completed at the register.  Therefore, later purchases of food cannot legally mitigate the loss number. Investigators observed countless instances when patrons failed to obtain any food at the time of the SNAP transaction.  Furthermore, multiple witnesses confirmed that Meadowayne and

Vermillion participated in the swiping of SNAP cards with the promise of delivering the associated food to the FLDS Storehouse in the future.  Although methods of SNAP consecration varied throughout the investigation period, donation of benefits without the receipt of any food products constituted the primary method of consecration at the peak of the fraud scheme, from January 2012 through December 2013, accounting for the majority of the fraud proceeds. (Exhibit-F).

Furthermore, the defendant cannot establish what amount food purchased later, if any, the legitimate beneficiaries received, nor can the defendant establish what amount of food went to non-beneficiaries or for the purchase of non-food products.  Finally, given the consistently poor quality of the food distributed by the Storehouse, the defendant cannot possibly equate the value of any food provided to beneficiaries with the amount of the consecrated benefits.

- ***The conservative nature of the fraud threshold***

The United States concedes that it cannot prove that every SNAP transaction of $100 or more at Meadowayne and Vermillion involved fraud.  Conversely, the United States can very well establish that many SNAP transactions under $100 at Meadowayne and Vermillion did involve fraud.  As the defendant directed members to consecrate everything they possessed, members necessarily consecrated SNAP amounts under $100, as specifically observed by investigators.  The conservative calculation used by the agents mitigates against the few non-fraud SNAP transactions of greater than $100.  The following samples of evidence obtained at the FLDS Storehouse, Quality, and Meadowayne pursuant to the search warrants support the conservative calculation:

- Consecration Records corresponding to transactions of less than $100. (Exhibit-E).
- A transcript of a voicemail from Eda Black Barlow to FLDS Storehouse on April 17, 2015 illustrates that members made SNAP consecrations of less than $100.[2]
- Although the investigators did not specifically examine SNAP transactions of less than $100 during the Title III period, the investigators observed and recorded several of these sub-$100 SNAP transactions.  (Exhibits-D at 5 & Exhbit-E).

The fact that many FLDS members utilized their cards at Costco and other stores to supply the FLDS Storehouse further underscores the conservative loss calculation.  (Exhibit-G). According to some witnesses, FLDS members were allowed to retain their SNAP cards and make purchases with the cards to supply Storehouse, or they were allowed to turn over their SNAP cards directly to the FLDS Storehouse.  Witnesses advised that these SNAP cards (consecrated directly to the FLDS Storehouse) were used at other retailers to supply the FLDS Storehouse.  These figures are not included in the SNAP fraud loss figure.

- ***Food disseminated outside of the Short Creek Community***

While Meadowayne, Vermillion, and the front companies did purchase food, witnesses confirm that the Short Creek Storehouse sent much of the food to FLDS communities in other states.  The FLDS leadership considered the other communities as more holy and blessed than Short Creek.  In order to maintain the secrecy of activities in those other communities, FLDS leaders forbade members of those communities from participating in welfare programs. Therefore, SNAP funds belonging to members residing in the Short Creek community supported FLDS members living in other communities.

---

[2] "Hi, this is Eda and I just need to know. I get twenty dollars on my food card every month. I just need to know what to buy with it. It's so much money, it's hard to know how to spend it, ya know? Anyway, if you could call and let me know, I'd be glad. My number's four three five two one two zero eight four zero. Thank you." (Found in Discovery - File Name: files\msg0000[4110599].WAV – located at 1B43).

Because of the significance of living in those other lands, those members received higher quality food products that were not available to FLDS members living in Short Creek.  One invoice from Nicholas and Company in the amount a $23,379.82 found on a Meadowayne computer illustrates the point (1B62.e01/Basic data partition in discovery).  The invoice identifies large amounts of high quality seafood (including snapper, scallops, seaweed, shrimp, squid, clams, swordfish, oysters, caviar, urchins, etc.).   Other than the defendant and possibly select other leaders, members shopping at Meadowayne or Storehouse in Short Creek never had access to that type of food.  (Exhibit-H).

- ***The FLDS Storehouse supplied food to non-beneficiaries***

As the defendant directed that all FLDS members obtain their food and other necessities from the Storehouse, non-beneficiaries necessarily received items purchased with SNAP funds.  Thus, the defendant cannot determine what amount of the fraudulent SNAP consecrations trickled back to the original SNAP consecrating households.  (Exhibit H).

- ***The Storehouse supplied poor quality food***

Countless witnesses verified to investigators that the Short Creek FLDS Storehouse maintained insufficient quantities of food to support its patrons, referencing often barren shelves.  Those witnesses further relate that the quality of the food was very poor.  Witnesses report that the Storehouse purchased second-hand food at a discount and that the food was often spoiled or expired.  As the investigators employed a very conservative method of calculating the loss generated by fraud scheme, the $11,237,261 estimation represents a reasonable loss calculation.

### 5.  SOPHISTICATED MEANS USED TO PERPETRATE THE FRAUD

According to its own business and accounting records, Meadowayne transferred funds to the FLDS front companies to further perpetuate the fraud and conceal the true ownership and control of the commingled SNAP funds.  (Exhibit D.1, D.2, D.3, D.4; Exhibit-A at 2).

Meadowayne transferred nearly $5,000,000 of commingled SNAP funds to the front companies, Quality and Prime.  Meadowayne recorded transfers to these FLDS Front Companies as "Cost of Goods Sold – Groceries Purchased for Resale." This internal accounting classification infers that 1) a valid vendor relationship existed between Meadowayne and Quality and Prime; and 2) Quality and Prime supplied half of Meadowayne's food inventory.  The evidence reveals that no such vendor relationship existed.  (Exhibit-A at 7-9).

Months of video surveillance confirm that neither Quality nor Prime delivered any food to Meadowayne.  In contract, surveillance footage reveals numerous deliveries from legitimate vendors like Nicholas and Company, UNFI Distributors, and Coca Cola.  Moreover, neither Quality nor Prime possess a physical warehouse.  No evidence exists for either entity regarding leasing, utilities, staffing, operations, or sales tax reporting.  Moreover, the signers on the relevant bank accounts were managers at the FLDS Storehouse.  Despite the fact that Meadowayne transferred over $4,000,000 of commingled SNAP funds to Quality for the purported purchase of food, investigators found no invoices confirming the transactions. The only known Quality invoices total $3,493, all of which relate to the purchase of appliances. (Exhibit-A at 10-12; Exhibit-C at 7, 8).

In February 2015, the vast majority of Meadowayne's commingled SNAP funds shifted from Quality to Prime.  On January 15, 2015, Prime registered as a business in the state of

Montana. An email dated January 26, 2015 referenced Lyle Jeff's involvement and approval of the transition from Quality to Prime.[3] (Exhibit-M).  On February 16, 2015, an FLDS Storehouse manager set up a bank account for Prime. The only business address provided by Prime corresponds to a single-family home in Helena, Montana.

Unlike with Quality, investigators did locate some food invoices at Meadowayne from Prime.  However, the invoices lacked customary types of necessary information and related to purported purchases of completely unrealistic quantities of perishable food allegedly shipped from the small residential address in Helena, Montana (e.g., $131,180 for a one month supply of peaches).  The fabricated invoices clearly represent an attempt at concealment.  (Exhibit-A at 9, 13-16;  Exhibit-C at 9).

In sum, Meadowayne engaged in a series of sophisticated methods designed to both avoid detection at the point of sale and conceal the later diversion of those SNAP funds. FLDS members describe the level of secrecy required to consecrate SNAP benefits through Meadowayne and Vermillion.  For example, Jessica Chatwin described how FLDS members would wait for non-FLDS members to vacate the store before consecrating benefits and how they would conduct the transactions without speaking.

---

[3] In the January 26, 2015 email from Nephi Allred to Kimball Barlow and others, Nephi Allred wrote:

*Sirs,*
*After talking with UL (**Uncle Lyle**) this morning, we will be closing down QWD. Boyd Knudson has already setup another entity to use going forward. You can contact him at (435) 212-0641 for further details.  We will need to work together in closing out the existing QWD vendor accounts as well as the bank accounts.  Feel free to call me with any wonderments or questions.*
*Thank you,*
*Nephi*

These SNAP consecrations represented a very important stream of income for Meadowayne, involving as much as 69% of its total reported income.  Income derived from other sources could not possibly cover the costs of farming, trucking, overhead, and fund transfers to the front companies.  (Exhibit-A at 5).  The manner in which these FLDS front companies were set up coupled with their appearance of being food vendors represents the elaborate steps FLDS leaders took to conceal and disguise the true sourse and control of the commingled SNAP funds.

Pursuant to USSG § 1B1.3, when sentenced for jointly undertaken activity, the defendant is accountable for the conduct of others.  Therefore, the defendant is accountable for the sophisticated money laundering committed by co-conspirators under his direction.  As an aggravating sentencing factor, the court should apply the rationale underlying the "sophisticated means" enhancement found at U.S.S.G. § 2S1.1(b)(3).  The Commentary to that guideline indicates that "sophisticated laundering typically involves the use of fictitious entities or shell corporations."  The Guidelines specifically authorize the court to depart upward based on conduct pertaining to a charge that was dismissed as part of a plea agreement.  U.S.S.G. § 5K2.21.  The United States submits that the use of front companies constitutes one factor justifying a high end sentence.

## 6.  IMPACT OF FOOD STAMP FRAUD SCHEME

Because of the fraud directed by the defendant, many families suffered extreme hunger, malnutrition, and related health issues.  The defendant's directives and corresponding threats of damnation for failure to comply created a Hobson's choice for members caught between feeding their families or losing their eternal salvation.

While members subsisted on whatever meager quantity of rice and noodles they could obtain from the Storehouse, the defendant retained a personal chef, and he regularly ate prime rib, halibut, lobster, scallops, and other expensive cuisine.  He sent his chef and family members to purchase his favorite foods that he could not obtain from the FLDS Storehouse (Exhibit-I).  The Storehouse's internal email messages and voicemail recordings from patrons memorialize the shortages of food, the poor quality of the available food, and that members were actually "starving."  (Exhibit-J).

### 7.  THE DEFENDANT'S FLIGHT

Agents arrested the defendant in late February of 2016 on fraud and money laundering charges.  The court set a trial date for October of 2016.  On June 9, 2016, after multiple detention hearings, the court released the defendant on specific conditions.   On June 19, 2016, the defendant removed the Global Positioning Satellite (GPS) monitoring device attached to his ankle and fled.  The defendant attached the GPS tracker to a running fan in an attempt to prevent the tracker from sending an alert message.

On June 20, 2016, the FBI launched an extensive, lengthy, labor and resource intensive investigation to locate and arrest the defendant.  The investigative efforts included: conducting neighborhood canvasses; handling numerous interviews; managing public tip lines; organizing local, state, and federal authorities to respond to numerous "sightings;" operating human source activities; and collecting and reviewing prison communications from Warren Jeffs.

The FBI also incurred thousands of hours of investigative effort and cost to employ sophisticated techniques, such as pen register trap and traces, subpoenas, search warrants, and tracking warrants.  Often these techniques resulted in drawn-out and protracted ground and aerial

surveillance operations involving local, state, and federal agencies.  Similarly, based on investigative intelligence and public tips in Canada, the Royal Canadian Mounted Police conducted similar operations to locate the defendant.

Aside from personnel costs, these investigative and technical efforts cost the U.S. Government tens of thousands of dollars.  The United States cannot calculate the costs incurred by local, state, and foreign law enforcement.  Another cost which United States cannot sufficiently calculated is opportunity cost associated with the inability to pursue other important criminal investigations over the course of the year that investigators searched for the defendant.

On August 25, 2016, after exhausting most material investigative leads and techniques to located the defendant, the FBI offered a $50,000 reward for information leading his arrest. Ultimately, the reward offer and assistance from the public led to the defendant's arrest.

On June 14, 2017, investigators finally arrested the defendant in Yankton, South Dakota.  His arrest followed 12 months of flight from prosecution.  Following a tip, investigators searched for the defendant throughout Yankton County, South Dakota and the surrounding area for two days, utilizing the assistance of local law enforcement.   The FBI paid eventually paid the tipsters the $50,000 reward.

During the course of the fugitive investigation, investigators learned that the defendant had been in direct and indirect communication with witnesses, co-defendants, and Warren Jeffs, all in direct violation of the conditions set by the court.

## 8.  THE DEFENDANT'S PRIOR MISCONDUCT

In determining what sentence to impose, the court must consider "the history and characteristics of the defendant."  18 U.S.C. § 3553(a).  Lamentably, instances of the defendant's

dishonest and anti-social behavior are too numerous and too lengthy to adequately cover in this memorandum.  (Exhibit K).  Nevertheless, the following list of conduct reported to law enforcement provides some insight regarding his character:

- ***Public Corruption***

Several witnesses relate that the defendant controlled who served in local municipal positions in Hildale, Utah and Colorado City, Arizona and that he maintained corrupt influence over those officials.  For example, the defendant reportedly ordered city officials to slow-walk the process of getting culinary water to certain, non-FLDS homes (i.e. Cooke family water dispute).  On another occasion, the defendant reportedly directed a police officer to falsely alter a police report in order to protect other FLDS Church leaders.  The defendant also reportedly placed a surrogate on the town council through whom the defendant dictated all major decisions for the city government.

In 2015, the United States Department of Justice brought a civil lawsuit against the cities of Hildale, Utah, and Colorado City, Arizona. The suit alleged that public employees of the towns discriminated against "nonbelievers" at the direction of FLDS church leaders, including the defendant, denying them utilities services and intimidating them with local police pressure. The defendant was the bishop during the period covered by the lawsuit.  The court ultimately found that the towns did discriminate against non-FLDS residents.

- ***Poaching with illegal weapons***

According to the defendant's son, Thomas Jeffs, the defendant directed and closely oversaw the illegal poaching of deer and elk at night by utilizing the night-vision, scoped rifles

equipped with sound suppressors and firing modified, sub-sonic ammunition.  The hunters then delivered the meat to the Storehouse for use by the FLDS members.

- ### *Child Labor violations*

In March of 2016, in relation to a civil lawsuit brought by the United States Department of Labor, a federal District Court Judge in Utah levied nearly $2 million in fines against Lyle Jeffs and others for the illegal use of child labor in pecan orchards.

- ### *Tax Fraud*

According to Ezra Nielsen, the defendant directed that the Hildale Health Service Center (HHSC) place the defendant and some of his wives on the HHSC payroll.  Although the defendant and his wives did not actually work at the business, they received salaries over the course of multiple years, totaling $8,000 to $10,000 per month.  Thereafter, the defendant and/or his wives falsely claimed the Earned Income Tax Credit on income tax returns.

- ### *History of Obstructing Justice*

According to a cooperating witness, Warren Jeffs and Lyle Jeffs, ordered an individual known to be on a Federal Grand Jury subpoena list to evade service by traveling to one of the organization's compounds in another state.  They instructed the individual not to use personal bank or cellular phone accounts in order to "hide…from the FBI." (FBI; FD-302; 318A-SU-5086073, serial 152; 1 December 2014; December 2005).

According to a law enforcement officer, in April 2015, peace officers working for the Colorado City Marshal's Office (CCMO), who were also members of the FLDS Church, obstructed law enforcement efforts to serve subpoenas on the defendant.  The CCMO deputies reportedly fabricated calls for service in order to distract another officer waiting to catch Lyle

Jeffs entering or exiting his home.  The circumstantial evidence suggests that the defendant, who knew of the attempts to serve him, ordered the obstructive conduct. (Law Enforcement Partner; E-mail; 46H-SU-6146162, serial 248; 13 January 2016; 19 April 2015).

Multiple witnesses advised that defendant provided aid to Warren Jeffs during his attempts to avoid arrest and flee from prosecution.  These overt acts by defendant included directing cash and other assets to assist his brother in evading capture.  The defendant also assisted by directing individuals, including FLDS security members, to insure that Warren Jeffs was not detected as he traveled to Short Creek and other areas.

- ***Operational Security and counter measures designed to obstruct law enforcement***

Numerous reports exist regarding the defendant's efforts to thwart law enforcement efforts to detect illicit conduct in the FLDS community and conceal perpetrators of the conduct. Those efforts include hiring armed security teams, creating a stand-alone communication network, preparing and utilizing means of escape, and maintaining strategic hiding locations. (FBI; FD-302; 318A-SU-5086073, serial 152; 1 December 2014; December 2005);  (FBI; FD-302; 318A-SU-5086073, serial 10; 18 June 2014; 18 June 2014); (FBI; FD-302; 318A-SU-5086073, serial 6; 6 June 2014; 2010); (FBI; FD-302; 92F-DL-102947, serial 173; 6 September 2005; 3 September 2005).

- ***Prepared Escape Plans***

According to a cooperating witness, FLDS internal security developed escape plans for the defendant and other organization leaders in the event of a law enforcement raid. The plans included placing all-terrain vehicles (ATV) in strategic locations around the building with matching clothing for defendant and decoy riders, in order to confuse law enforcement trying to

identify him.  Security also staged getaway vehicles and built hidden bunkers around the

community. (FBI; FD-302; 318A-SU-5086073, serial 6; 6 June 2014; 2010).

On one occasion in 2006, the defendant used these methods to successfully escape during

a law enforcement raid by fleeing on an ATV and retreating to a covert apartment in the

community. At the apartment, the defendant got on a sport motorcycle and traveled to Beryl,

Utah to hide out for several days.  According to a witness, the defendant, being aware of the

potential of the FBI raid, instructed a member of the congregation to give a long opening prayer

to allow him time to escape. (*The Salt Lake Tribune*; "How a prayer and an ATV helped

polygamist Lyle Jeffs evade the FBI"; 22 January 2016 http://www.sltrib.com/blogs/3449054-

155/how-a-prayer-and-an-atv?fullpage=1).

## CONCLUSION

Based on the foregoing the United States respectfully request that the court impose a

5-year term of imprisonment.

DATED this 1ˢᵗ Day of December, 2017.

JOHN W. HUBER
United States Attorney

*/s/ Robert A. Lund*
ROBERT A LUND
Assistant United States Attorney