IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LYLE STEED JEFFS,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER<br><br><br>Case No. 2:16-CR-82 TS<br><br>District Judge Ted Stewart |

Defendant Lyle Steed Jeffs is scheduled to be sentenced on December 13, 2017. Both parties have raised objections to the Presentence Report. The Court will address those objections below.

I. BACKGROUND

Defendant Lyle Steed Jeffs, along with ten others, was charged in an Indictment with conspiracy to commit Supplemental Nutrition Assistance Program ("SNAP") benefits fraud and conspiracy to commit money laundering. A Superseding Indictment was returned on June 21, 2017, adding a charge of failure to appear.

On September 20, 2017, Defendant pleaded guilty to conspiracy to commit SNAP benefits fraud and failure to appear. Pursuant to the plea agreement, the parties agreed, under Federal Rule of Criminal Procedure 11(c)(1)(C),[1] to a sentence of 1 year imprisonment on the

---

[1] Under Rule 11(c)(1)(C), the parties can "agree that a specific sentence or sentencing range is the appropriate disposition of the case." Fed. R. Crim. P. 11(c)(1)(C). Once the Court accepts the plea agreement, that recommendation or request becomes binding on the Court. *Id.*

1

failure to appear charge, which is to run consecutively to a period of 2 to 4 years on the conspiracy to commit SNAP benefits fraud charge.

The Presentence Report prepared in this case reflects a base offense level of 6. The Presentence Report contains a 20-level enhancement based on the amount of loss, a 4-level enhancement for Defendant's role in the offense, a 2-level enhancement for obstruction of justice, and a 3-level reduction for acceptance of responsibility. This results in a total offense level of 29. With a criminal history category I, the advisory guideline range is 87 to 108 months.

The parties make two primary objections to the Presentence Report's calculations. First, Defendant objects to the determination of the amount of loss. Second, the government objects to the 2-level enhancement for obstruction of justice. Neither party has objected to the base offense level of 6 or the 4-level increase for Defendant's role in the offense. Therefore, the Court will not address them. As set forth below, the Court will sustain Defendant's objection to the loss amount and overrule the government's objection to the obstruction of justice enhancement. The parties also make a number of other minor objections, all of which will be overruled.[2]

## II. DISCUSSION

Defendant's offense level is first determined by reference to United States Sentencing Guideline ("USSG") § 2B1.1. As will be discussed further below, Counts 1 and 3 are grouped together, with the failure to appear count treated as an obstruction of justice enhancement under USSG § 3C1.1.[3]

---

[2] Other objections that were addressed in the Addendum are not discussed.

[3] *See* USSG § 2J1.6, Application Note 3 ("[I]n the case of a conviction on both the underlying offense and the failure to appear, . . . the failure to appear is treated under § 3C1.1 . . . as an obstruction of the underlying offense, and the failure to appear count and the count or

A.  LOSS AMOUNT

In this case, Defendant has a base offense level of 6.[4] The base offense level is then increased by the amount of the loss. Under the Sentencing Guidelines, "loss is the greater of actual loss or intended loss."[5] "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," while "intended loss" is "the pecuniary harm that the defendant purposely sought to inflict."[6]

In the case of government benefits, such as food stamps, the "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses."[7] "For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50."[8]

Where evidence of direct loss is not available, the Court "need only make a reasonable estimate of the loss."[9] "The estimate of the loss shall be based on available information, taking

---

counts for the underlying offense are grouped together under § 3D1.2(c)"); *see also id.* § 3C1.1, Application Note 8 ("If the defendant is convicted both of an obstruction offense . . . and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of § 3D1.2 . . . . The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.").

[4] *Id.* § 2B1.1(a)(2).
[5] *Id.* § 2B1.1, Application Note 3(A).
[6] *Id.* Application Note 3(A)(i), (ii).
[7] *Id.* Application Note 3(F)(ii).
[8] *Id.*
[9] *Id.* Application Note 3(C).

into account," a variety of factors.[10] "But a loss estimate is reasonable only when it is calculated under a reasonable method."[11]

The government has proposed a loss amount of $11,237,261, which would result in a 20-level increase.[12] This amount is based largely on analysis from the United States Department of Agriculture ("USDA"). Under the USDA analysis, fraud is presumed where a transaction is more than 300% of the national average. The national average transaction amount for stores like Meadowayne Dairy Store ("Meadowayne") and Vermillion Cliffs Produce ("Vermillion") is $25. Thus, according to the USDA, any transaction involving SNAP benefits over $75 is indicative of fraud. Using a more conservative estimate, the government has identified all SNAP redemptions at these stores over $100 and has used this number to support the loss amount.

The government's proposed methodology is flawed for several reasons. First, no information has been presented to support the USDA's 300% fraud standard. While the government indicates that the USDA routinely applies this standard, the basis for this standard has not been provided to the Court. Second, the USDA's standard appears to be used to identify potential fraud.[13] However, the government uses this standard as a basis to identify actual fraud. Third, the government's proposal fails to account for several unique factors present in the FLDS community, including the large household size and the limited points of redemption for SNAP

---

[10] *Id.*

[11] *United States v. James*, 592 F.3d 1109, 1115 (10th Cir. 2010).

[12] *See* USSG § 2B1.1(b)(1)(K) (increasing the offense level by 20 if the loss was more than $9,500,000).

[13] Docket No. 882, at 6 ("Using the USDA fraud standard of 300% of the average transaction size, SNAP transactions of $75 or more at a large grocery store would *presumably* involve fraud.") (emphasis added).

4

benefits. Such factors have been identified by the USDA in the past as possible explanations for fraud indicators in the Short Creek area.[14] Finally, and perhaps most importantly, the government's analysis defies logic. The government would have the Court believe that every cent of purchases over $100 was "obtained by unintended recipients or diverted to unintended uses."[15] There is no evidence to support this assertion.

The government attempts to support its methodology by other evidence. The government asserts that pole camera analysis showed that a large number of transactions of $100 or more involved patrons who swiped their SNAP cards, receiving little or no food in return. However, it is unclear how many of these transactions were at or near the $100 threshold, as opposed to a higher amount. The government also points to Title III analysis, stating that the analysis revealed that nearly 84% of transactions at or above the $100 threshold involved fraud. However, this analysis suffers from the same defect as the pole camera analysis.[16] Specifically, it is unclear just how near the $100 threshold these transactions were. Further, an examination of the Title III analysis shows that the average fraudulent transaction was over $400.[17] While the average transaction amount is not a good proxy for determining fraud, it does cast doubt on the government's $100 fraud threshold.

---

[14] Docket No. 884 Ex. 2–4.

[15] USSG § 2B1.1, Application Note 3(F)(ii).

[16] The Title III analysis also identifies fraud indicators that are inconsistent with the Court's prior rulings. See Docket Nos. 696, 862.

[17] The government found that 560 transactions involved fraud, with a total SNAP amount of $239,379.53. Using these numbers, the average transaction amount was $427.46. Docket No. 882 Ex. L.

5

The government also relies on witness statements to corroborate the $100 fraud threshold. The government points to Alleen Steed, who told investigators that transactions over $100 likely involved diverted funds. This statement, however, is directly contradicted by Sheryl Barlow, who told the FBI that the average transaction for most United Order families was close to $400.[18] The government further relies on "Monthly Family Expense Reports" to support the $100 fraud threshold. However, these reports generally show amounts far greater than $100 were consecrated.[19] In sum, the government's methodology is sufficiently flawed that it does not provide a reasonable method to determine the amount of loss.

In its Reply brief, the government proposed a methodology based on the Title III investigation.[20] This methodology does not suffer from many of the same flaws. However, the Court will not consider arguments made for the first time in reply.[21]

Mr. Jeffs has proposed an estimated loss amount of $2,096,918.77, which would result in a 16-level enhancement.[22] This estimated loss amount is derived from the analysis of Chesley Erickson. Mr. Erickson reaches this estimate by calculating all SNAP proceeds received by Meadowayne and Vermillion during the relevant years. He then "subtracts the verifiable SNAP food purchases from the aggregate SNAP receipts, leaving a specific amount of SNAP benefits that cannot be conclusively . . . attributed to food purchases."[23]

---

[18] Docket No. 885 Ex. 7, at 5.

[19] *See* Docket No. 882 Ex. D, at 39–43.

[20] Docket No. 886, at 2.

[21] *See Pickering v. USX Corp.*, 758 F. Supp. 1460, 1461 n.2 (D. Utah 1990).

[22] *See* USSG § 2B1.1(b)(1)(I) (increasing the offense level by 16 if the loss was more than $1,500,000).

[23] Docket No. 884, at 10.

The government disagrees with this analysis, arguing that the fraud occurred at the time of the transaction and should not be offset by later purchases of food. But the timing of when the fraud occurred and the amount of the loss involved are different questions. In cases involving government benefits fraud, the loss is the value of the benefits "obtained by unintended recipients or diverted to unintended uses."[24] So, while the fraud may occur at the time of purchase, the amount of loss must be determined by considering the value of benefits obtained by unintended recipients or diverted to unintended uses. If a SNAP recipient ultimately receives some amount of food after the donation of benefits, it is appropriate under the Guidelines to offset that amount. In such a circumstance, the benefit was obtained by the intended recipient and, at least eventually, was put to its intended use.

The government also attacks certain accounting errors in Mr. Erickson's analysis.[25] However, even crediting these errors, the government would have to show that Mr. Erickson failed to account for nearly $1.5 million in fraud in order to alter the guideline range. This, it has not done.

The government also argues that Defendant cannot establish how much of the purchased food eventually made its way to SNAP beneficiaries. The government is correct. Mr. Erickson's analysis identifies the amount of money that cannot be conclusively tied to food purchases, meaning it was diverted to unintended uses. However, the analysis assumes that the food purchased with the use of SNAP benefits eventually made its way to SNAP beneficiaries. This is a faulty assumption. The evidence shows that food obtained through the use of SNAP benefits

---

[24] USSG § 2B1.1, Application Note 3(F)(ii).
[25] Docket No. 886, at 4–7.

was shared with non-eligible individuals. Thus, Mr. Erickson's analysis fails to fully account for the value of benefits obtained by unintended recipients. This failure means that Mr. Erickson's analysis underestimates the total amount of loss, though it is unclear by how much.

Another flaw in Mr. Erickson's analysis is that it focuses on the businesses involved in supplying food to the Short Creek area, rather than on the SNAP beneficiaries. But, as the government concedes, it would be logistically impossible to review over 247,000 SNAP transactions to determine which transactions involved fraud.[26] Given the limited number of vendors and suppliers in the community, analyzing the transactions of these businesses provides a good estimate of the amount of SNAP benefits that were ultimately used to purchase food. But, as discussed, this amount fails to fully account for the amount of loss.

In the end, Mr. Erickson's analysis is more reflective of the Sentencing Guidelines, Tenth Circuit precedent, and the Court's prior rulings, and does not suffer from nearly the same flaws as the government's proposed methodology. Therefore, the Court will adopt Mr. Erickson's loss estimate of $2,096,918.77, which results in a 16-level enhancement.

B.   OBSTRUCTION OF JUSTICE

The Presentence Report also includes a two-level enhancement for obstruction of justice. USSG § 3C1.1 provides for a 2-level increase

> [i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

---

[26] Docket No. 882, at 4.

Examples of covered conduct include "willfully failing to appear, as ordered, for a judicial proceeding."[27] Here, it is undisputed that Defendant willfully failed to appear.

The government, however, objects to the inclusion of this enhancement. The government relies on Application Note 7 of USSG § 3C1.1. Application Note 7 provides that if a defendant is convicted of failure to appear, this adjustment generally would not apply. However, Application Note 7 only applies when the obstruction offense is the sole count of conviction. Thus, the government's reliance on this Application Note is misplaced.

Application Note 8 makes clear that if a defendant is convicted of both an obstruction offense and an underlying offense, as is the case here, the count for the obstruction offense is to be grouped with the underlying offense.[28] In that circumstance, the offense level is "the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater."[29]

Here, Defendant pleaded guilty to both an obstruction offense and the underlying offense of conspiracy to commit SNAP benefits fraud. Therefore, Application Note 8 applies. Under Application Note 8, the offense level is the offense level for the underlying offense, with the two-level enhancement under § 3C1.1, so long as it is greater than the offense level for the obstruction offense, which it is. Therefore, the guidelines have been properly calculated and the government's objection is overruled.

C.   OTHER OBJECTIONS

---

[27] USSG § 3C1.1, Application Note 4(E).

[28] *See also id.* § 2J1.6, Application Note 3.

[29] *Id.* § 3C1.1, Application Note 8; *see also United States v. Gigley*, 213 F.3d 503, 505–06 (10th Cir. 2000).

*1.     Offense Conduct*

Defendant objects to paragraphs 5 through 39 of the Presentence Report. Defendant contends that many of the facts in those paragraphs are in dispute and are based on assumptions or conclusions "not grounded in reality."[30]

Federal Rule of Criminal Procedure 32(i)(3)(B) states that the court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." However, "to invoke the district court's Rule 32 fact-finding obligation, the defendant is required to make 'specific allegations' of factual inaccuracy."[31]

Here, Defendant has failed to make specific allegations of factual inaccuracy. Instead, he "objects generally" to 35 separate paragraphs of the Presentence Report. This type of general objection is insufficient to invoke the Court's fact-finding obligation under Rule 32. Therefore, Defendant's general objection to the offense conduct section of the Presentence Report is overruled.

Defendant further objects to any and all references to money laundering. The Court may consider this information as relevant conduct under USSG § 1B1.3. Therefore, Defendant's objection is overruled.

*2.     Sophisticated Means*

---

[30] Docket No. 884, at 1.

[31] *United States v. Rodriguez-Delma*, 456 F.3d 1246, 1253 (10th Cir. 2006).

The government also argues that the use of sophisticated means justifies a sentence at the high end of the agreed upon range. While the government relies on the sentencing guidelines to support its argument, it does not appear to be seeking an upward departure under the guidelines. As a result, the Court need not decide whether an enhancement for the use of sophisticated means is proper.

To the extent the government is seeking an upward departure, the Court denies that request. The vast majority of the conduct at issue in this case is rather simple, especially the conduct of Defendant. The government points to the use of fictitious entities and shell corporations to support its request.[32] The characterization of these entities as fictitious or shell corporations is hotly contested and, based on the information presented, the Court cannot conclude that they were fictitious entities or mere shell corporations. Moreover, even accepting this characterization, the use of these entities is not especially complex. Therefore, the Court will deny the government's request for an upward departure. Instead, the Court will consider the parties' arguments with respect to this issue in determining the appropriate sentence.

3.  *Statements from Defendant's Family*

The government objects to the inclusion of certain statements from Defendant's family members, as contained in Paragraphs 75 and 77 of the Presentence Report. The government argues that these statements are not relevant and should not be included. The government has failed to provide a sufficient basis for the removal of these statements. Therefore, the government's objection is overruled.

---

[32] USSG § 2S1.1, Application Note 5(A)(i), (ii) ("Sophisticated laundering typically involves the use of fictitious entities [or] shell corporations.").

### 4. *FLDS Church Commercial Activities*

Defendant objects to the statements in Paragraph 84 that the FLDS church engages in commercial activities and that he was the chief executive of the FLDS church. There is ample evidence to support these statements. Therefore, Defendant's objection is overruled.

### III. CONCLUSION

Based on the above, the Court finds as follows:

- Defendant's base offense level of 6.

- With a loss amount of more than $1,500,000, he receives an increase of 16 levels.

- Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, resulting in a 4-level increase under USSG § 3B1.1(a).

- Defendant qualifies for a 2-level enhancement under USSG § 3C1.1, as discussed.

- Defendant also qualifies for a 3-level reduction for acceptance of responsibility under USSG § 3E1.1.

- Defendant has a total offense level of 25.

- With a criminal history category of I, the advisory guideline range is 57 to 71 months.

With all objections having been resolved, the parties should focus their arguments at the sentencing hearing on the factors set out in 18 U.S.C. § 3553(a).

DATED this 11th day of December, 2017.

BY THE COURT:

_____
Ted Stewart
United States District Judge